## WALTERS *v.* STOCKBERGER.

[No. 2,435.    Filed May 25, 1898.]

WORDS AND PHRASES.—*Construction.—Rules of Court.—Change of Venue.*—Where a rule of court requires that applications for change of venue must be made by the second Wednesday of the term of court, an application made on the second Wednesday is a sufficient compliance with the rule.    *pp. 279, 280.*

MARRIAGE.—*Contract of Marriage.*—No particular form of words is necessary to constitute a marriage contract.    *p. 282.*

BREACH OF MARRIAGE PROMISE.—*Repudiation of Contract.—Action for Breach.*—Before an action can be maintained for the breach of a marriage contract it must be alleged and proved that the contract has been repudiated, and such repudiation must be shown by the acts, words, or conduct of the party who so repudiates it, and to be without sufficient reason or cause.    A mere request for a postponement of the marriage ceremony for reasonable cause does not amount to a repudiation or renunciation of such contract.    *pp. 282-289.*

From the Miami Circuit Court.    *Reversed.*

*G. W. Holman* and *Conner & Rowley,* for appellant.

*M. A. Baker, James H. Bibler, M. L. Essick* and *Nott N. Antrim,* for appellee.

WILEY, J.—This was an action by appellee against appellant to recover damages for an alleged breach of a marriage contract.    The suit was commenced in the Fulton Circuit Court.    The venue was changed to the Miami Circuit Court, where a trial was had before a jury, and a verdict returned in favor of appellee, awarding her damages in the sum of $4,200.00.    Pending appellant's motion for a new trial, the appellee entered a remittitur of all the judgment but $1,200.00, whereupon the motion for a new trial was overruled, and final judgment pronounced.

As no question is presented by the assignment of errors as to the sufficiency of the complaint, and the affirmative paragraph of answer, we will but notice

them briefly. The complaint was in two paragraphs, and in the first paragraph it is alleged that the appellee was on November 28, 1894, an unmarried woman, and that by the mutual agreement of the parties, appellant agreed and promised to marry her on December 14, 1894; that on said day she was ready and willing to marry him, but that he neglected and refused to marry her, and he has ever since so neglected and refused. The second paragraph is like the first as to the promise and breach, and differs from it only in that it is averred that relying upon appellant's promise, she made preparation for such marriage, at considerable expense, and that in such preparation the appellant participated, etc.

The answer was in one paragraph, and it is therein averred that at the time said promise was made, which promise he denied, appellee was an unchaste woman; that the same was unknown to him, and that without the connivance of appellant, she did, on a certain day, have illicit carnal intercourse with a person named, and that appellant was then ignorant thereof. The answer contained a denial of all other matters in the complaint not therein specifically denied.

The errors assigned are as follows: (1) The court erred in granting a continuance  *  *  *  on the application of the appellee. (2) The court erred in granting a change of venue  *  *  *  on the affidavit of appellee. (3) The court erred in overruling appellant's motion to strike out affidavit for change of venue. (4) The court erred in overruling appellant's motion for a new trial. The first error assigned is expressly waived by appellant, and we will consider the remaining questions in the order counsel have discussed them. The second and third specifications of the assignment of error, do not present any questions, but the points involved therein, are properly saved in

the motion for a new trial, and presented by the fourth assignment of error.

On February 12, 1896, being the ninth judicial day of the February term, 1896, of the Fulton Circuit Court, the appellee filed her motion, supported by affidavit for a change of venue from the county, and over appellant's objections, the motion was sustained, and the venue ordered changed. The reason assigned in the affidavit for the change was that appellant had an undue influence over the citizens of said county, and that by reason thereof she could not have a fair and impartial trial therein. Appellant makes no objection to the form and substance of the affidavit, but contends that it was not filed in time, under a rule of court then in force. The rule referred to is as follows: "All applications for a change of venue must be made by the second Wednesday of each term, or the right shall be deemed waived;" *   *   * The complaint in the case at bar was filed on December 24, 1894, and summons issued the same day. We judicially know that the February term, 1896, of the Fulton Circuit Court commenced on the first Monday of February, 1896, being the third day of said month. On the 12th of February the affidavit for a change of venue was filed. That was on Wednesday, the ninth judicial day of the term, and the second Wednesday. The question is properly presented by a bill of exceptions. The order granting the change contained the following entry: "For the reason that it has been the universal practice, under rule six of the rules of this court, to allow motions for a change of venue to be filed on the second Wednesday of each term, and to grant changes of venue from the county on affidavit and motion filed on such second Wednesday." We do not understand why the court made this entry, and are clearly of the opinion that it does not add any force to the rule of the court quoted.

As we have seen, the rule provided that motions for change of venue should be made "by" the second Wednesday. It seems to us that a reasonable construction of the rule would be to hold that the word "by" does not mean that the application must be made before the second Wednesday, but is broad enough to include such day, and that if the application is then made, it is a sufficient compliance with the rule. It was held in Alabama that where an order required a plaintiff to give security for costs *by* the next term, it was a compliance with the order if the bond was filed any time at or before the next calling of the cause during the term to which the cause was continued. *Reese* v. *Billing*, 9 Ala. 265. In that case the court said: "There is nothing so potent in the terms 'by the next term,' etc., as to conflict with this conclusion. It is clearly allowable, consistently with the rules of interpretation, to construe 'by' to mean 'on,' or 'at.'"

In Montana it was held that an order of court to file certain papers *by* a certain day, was complied with by filing them on that day. *Higley* v. *Gilmer*, 3 Mont. 433. It has also been held that a rule to plead *by* a particular day, that such day was construed to continue until the office was open the next day, or morning. *Oxley* v. *Bridge*, 1 Doug. 67. But aside from this construction of the rule, we do not think there was any reversible error in sustaining appellee's motion for a change of venue. If, as appellant contends, the application was not made in time, under the rule, it was a matter largely within the discretion of the trial court, and it not appearing that such discretion was abused, or that the appellant was injured thereby, there was no error in sustaining the motion. This disposes of the second assignment of error.

The appellant moved to strike out the affidavit in support of the motion for a change of venue, and this

motion the court overruled. This ruling is the basis of the third assignment of error. What we have said as to the second assignment of error, applies with equal force here, and this leads to the conclusion that there was no error in overruling appellant's motion.

Appellant assigned thirteen reasons for a new trial, and the overruling of such motion is challenged by the fourth assignment of error. The first ground for the motion was that the verdict is not sustained by sufficient evidence, and counsel have argued this at some length. Appellant insists that there is not sufficient evidence to show that any marriage contract was ever made between appellant and appellee, and hence the evidence is insufficient to support the alleged breach. This insistence is not maintainable. Briefly stated, it appears from the evidence that appellant was a widower, about sixty-six years old, and that appellee was a widow, about twenty-four years old. They both had children, those of the appellee being infants. Appellant was a retired farmer and was worth probably about $20,000.00. The appellee was in indigent circumstances and was receiving charitable donations. Up to about the 23rd of November, 1894, they were strangers to each other, and through some ladies, who were making some provision for appellee, appellant heard of her, called on her and gave her some assistance in a financial way. The appellee testified that on or about the 28th day of November, 1894, appellant proposed marriage to her; she accepted the proposal and that they mutually agreed to marry each other, and that said marriage should be consummated about December 14, 1894. Appellant in his own behalf, denied these statements, and testified that no contract of marriage was ever made between them; that the matter was never talked of, and while he admitted that he was at the home of the appellee on one or more

occasions, he says he went to inquire about her welfare and condition and to minister to her temporal necessities.

Where there are no legal disabilities existing, an offer of mariage by one person to another, and an acceptance of such other, such offer and acceptance constitute a marriage contract. No formal words are necessary, and it is sufficient if both parties understood it to be an offer of marriage. An additional element of the contract is, that the acceptance must be made known to the party making the offer. As there must be a consideration to support all contracts, so there must be a consideration in a marriage contract, and the mutual promises of the parties constitute the consideration. As to these elementary principles, we cite 4 Am. and Eng. Ency. of Law (2nd ed), pp. 882 to 889, and authorities there cited. There being some evidence that there was a marriage contract, and that question having been submitted to the jury and determined by them, we cannot disturb the judgment on that ground.

There is some conflict in the evidence as to dates when appellant and appellee met, and when the contract was finally consummated, as testified to by appellee, but it is not our province to reconcile this conflict, and in any event the exact dates do not constitute the essence of the contract.

Counsel for appellant insist that the short acquaintance between appellant and appellee, the disparity in their ages, and the fact that the evidence shows that there were no acts or manifestations of love or affection between them, are enough to discredit the appellee. These were all questions the jury had before them and doubtless weighed, and we cannot consider them.

Appellant next contends that the evidence wholly

Walters *v.* Stockberger.

fails to show that if there was a promise of marriage, and that promise was mutual, there was a breach of the contract on his part; and we are inclined to the opinion that there is some merit in this contention. The question of the existence of a marriage contract having been fairly established as determined by the jury, and the time of the marriage having been fixed, before the appellee could recover it was necessary for her to establish by a fair preponderance of the evidence, two additional facts, viz: (1) That appellant refused to marry her, and (2) that she was ready and willing to marry him. As to the latter fact, we think the evidence fairly shows her readiness and willingness to marry. She was a widow, in straightened circumstances, with two small children; she had been divorced from a former husband; the appellant had shown her some attention; he had purchased for her four dresses and had had three of them made for her; he was a retired farmer in good financial circumstances; he had furnished her some groceries and a fur wrap, and had given her five dollars with which to purchase a new bonnet. In addition to these facts, some of which strongly indicate that she was in a marrying mood, she testifies that she was ready and willing to marry appellant, and that she could not see any good reason why the ceremony should be delayed. In fact her evidence shows a burning and impatient anxiety to marry. But as to appellant's refusal to marry her, the evidence is not by any means satisfactory, and as to the facts upon this point we must look alone to appellee's evidence. According to her evidence, appellant visited her frequently, and after he had called on her a few times, he asked her, on or about November 26, to marry him. She says she did not give him any answer at that time, but promised him that she would soon. He called again No-

vember 28, and asked her if she was ready to answer his question, to which she replied that she was, and that she would marry him; that they agreed that they would marry on December 14, 1894, and that they would go either to Peru or Plymouth to get married; that after November 14, he still continued to call on her. And now, as to the question of the breach or refusal to marry her, we quote the following questions and answers. Q. "Well, were you married on the 14th of December, 1894? Ans. No, sir. Q. Did he present himself at that date? Ans. No, sir. Q. Did you see him afterward concerning it? Ans. Yes, he called there after that at my house. Q. Have any conversation with him about it? Ans. Yes. Q. What was it? Ans. He said he would wait awhile. Q. Was that after the 14th of December? Ans. Yes. Q. What reply did you make? Ans. I told him I would rather not wait; that I had everything ready and would rather go on with it."

She testified further that he called again, and they talked the matter over, and he again said he wanted to wait awhile, and that she again told him she was not in favor of waiting. She also testified that he then told her he wanted to wait awhile because his children objected to his marriage. Again she testified as follows: "Q. Do you remember of being at Phil. Stockberger's after that,—24th December? A. Yes I was there at that time. Q. Was the defendant there? A. Yes. Q. You may state to the jury what was said between you and him? A. Well, he just talked on other subjects for a while until the other ladies went out, * * * then he asked me to speak to me privately, and I told him anything he had to say he could say before Mr. Stockberger, then he asked me why I did this, and I told him he didn't do as he agreed to. I told him he promised to marry me and

he didn't do it.   Q.   What did he say?   A.   Well he said he didn't think it was too late yet."

On cross examination the following questions were propounded to her and answered:   Q.   "   *   *   * Now then, you knew on the 14, he didn't call in accordance with the statements you made, and that he came and wanted to postpone the matter.   Now he hadn't stated then that he would not marry you, had he?   Up to the time you filed the complaint had he ever said he would not marry you?   A.   I don't know whether he said that or not.   I don't think he did just say that."

She then testified that on December 23, she went to Phil. Stockberger's, who was her brother-in-law, and sent for and consulted an attorney, and on the following day commenced her action.   Within nine days from the time the marriage was to have been consummated, as shown by appellee's evidence, which stands uncontroverted, and even before appellant had renounced the contract or refused to marry her, we find this woman seeking solace for her wounded affections and lacerated heart in the counsel of her lawyer, preparatory to the commencement of her action for damages, and which action was commenced within ten days of the time fixed for the marriage.

According to her evidence, which stands alone upon the subject, the appellant visited appellee after the 14th of December.   They talked over the subject of their contemplated marriage, and appellee says appellant went no further than to say that on account of his children, he wished to postpone the marriage for awhile, and she distinctly says that up to the time she commenced her action, he had not refused to marry her, and had not renounced the marriage contract.   Even on the day the suit was commenced, he called on her, and asked her what she had done this

for (meaning commencing the action), and she replied that he had not done as he promised, and to which he replied that it was not yet too late. These facts show conclusively that appellant, up to the time the action was commenced, had not renounced the contract nor refused to marry appellee. If this is true, then there was no breach, and the action was premature. The performance of a contract may, as a general rule, be postponed by one party, even without the consent of the other, for a good and sufficient reason. To illustrate: Suppose that on the morning of the day the alleged marriage was to have been consummated, a member of appellant's family had died, and before the burial several days had necessarily expired, would it be contended, that even if appellant had not notified his *fianceé*, that the marriage would have to be postponed, that would constitute such a breach of the contract that a right of action would immediately accrue for damages? Or if appellant had been compelled to travel by rail to reach the marriage feast and had been delayed by an accident resulting in his injury, which would disable him for many days, that this would constitute a breach of the contract? We think not.

Here, as the record shows, appellant had a family of five children, all of whom had attained their majority and all were married but one. He owed at least some consideration to them, and if they were opposed to his marriage with appellee, and he knew it, it was his duty if he could to reconcile them to it, and it was not unreasonable for him to want to postpone the marriage for that purpose. The record clearly shows that neither by word, act or deed did appellant renounce his alleged marriage contract, but on the contrary shows that he intended to perform it. We recognize the rule that a renunciation of the contract carries

Walters *v.* Stockberger.

with it an immediate right of action, and after the express breach, a subsequent offer to perform it, while it might be considered in mitigation, would not itself defeat a recovery. Even if a day for the marriage has been fixed, it has been held that a failure to marry on that day does not necessarily constitute a breach, as the contract is deemed to continue in force until one or the other of the parties, either by words or by conduct, shows that he or she is unwilling to fulfil the contract.  *Kelly* v. *Renfro,* 9 Ala. 325, 44 Am. Dec. 441. The case from which we have just quoted is directly in point, and the only one we have been able to find. We approve it, because it is sound in principle and in harmony with the great weight of authority.

In *Kurtz* v. *Frank,* 76 Ind. 594, it was said: "If before the suit was brought, the appellant had renounced the contract and declared his purpose not to keep it, that constituted a breach for which the appellee had an immediate right of action." To the same effect in principle are the following: *Burtis* v. *Thompson,* 42 N. Y. 246, 1 Am. Rep. 516; *Halloway* v. *Griffith,* 32 Ia. 409, 7 Am. Rep. 208, note; *Frost* v. *Knight,* L. R. 7 Exch. 111, 1 Moak's Eng. Rep. 218.  In *Adams* v. *Byerly,* 123 Ind. 368, it was charged that appellant promised to marry appellee on April 30, etc.; that the promise or agreement was mutual; that he refused to marry her on that date and persisted in his refusal till June 7, following, when suit was commenced.  The court said: "A refusal to comply with his contract, without any apparent or sufficient reason, gave the plaintiff below an immediate right of action.  Any conduct of a party who has promised to marry another, which amounts to a repudiation of the contract, renders the contract no longer obligatory on the other, and constitutes such a breach as entitles the latter to sue.  Thus, where the agreement was to

marry "in the fall," and the defendant in the month of October declared his purpose not to perform the contract, it was held that the action might be brought immediately." Citing *Burtis* v. *Thompson, supra,* and *Holloway* v. *Griffith, supra.* Proceeding, the court said: "A right of action accrues upon a marriage engagement whenever the defendant by words or conduct evinces his purpose not to proceed with his contract." Citing *Kelly* v. *Renfro, supra.*

In *Jones* v. *Layman,* 123 Ind. 569, appellant wrote appellee that he had heard rumors and reports about her which were derogatory to her character, and that he would not visit her until he had investigated them and learned whether or not they were true. After writing this letter, a month or more elapsed and no communication passed between them, when she commenced her action. The court said: "When all the evidence is considered, including the letter, we are not prepared to say that there was no evidence to show a breach of the contract, if a contract existed between the parties." In Kansas it has been held that a positive refusal to perform a contract to marry, even if made before the time for performance, is such breach as will authorize an immediate action for damages. *Kennedy* v. *Rogers,* 2 Kan. App. 764. In Virginia it was held that a repudiation of his marriage contract, in *toto,* even where no day was fixed, gave the woman an immediate right of action. *Burke* v. *Shaver,* 92 Va. 345, 23 S. E. 749.

We have cited these authorities in support of the universal rule that before a right of action accrues for the breach of a marriage contract, it must be averred and proved that the contract has been repudiated and such repudiation must be shown by the acts, words, conduct or deed of the party who so repudiates it, and to be without sufficient reason or

cause.   There must be a refusal to marry, or a repudiation in some way of the contract.   A mere request for a postponement of the marriage ceremony for an expressed and reasonable cause, does not, in law, amount to a repudiation or renunciation of the contract, and that, at most, is what the record shows in this case.   There is a total failure of evidence to support a pivotal question in the case, and in the absence of such evidence, the judgment should not stand.   Even during the time between December 14, when appellee says the marriage was to have been consummated, and the 23rd day of December, when she consulted her lawyer, and up to the day the suit was commenced, appellant and appellee were in communication.   She says he continued his visits to her; they talked the matter over; that he merely wanted to postpone the marriage feast, and that he did not repudiate or renounce the contract.   She says there was no demonstration of love or affection between them.   On her part at least, it seems to have been a mere business or mercenary transaction.   Her suit was commenced with precipitous haste, and according to her own evidence (and she stands alone on the question), before any breach of the contract occurred.

Under these facts, the judgment must be reversed. This makes it unnecessary for us to decide other questions presented by the record, as they will not likely occur in a subsequent trial. The judgment is reversed, with instructions to the court below to sustain appellant's motion for a new trial.

### DISSENTING OPINION.

COMSTOCK, J.—I cannot concur in the opinion of the majority of the court.

The jury found, and were warranted from the evi-

dence in so finding, that the appellant and appellee had mutually promised to marry. Appellee was ready and willing at the appointed time to carry out her agreement. The defendant failed to appear, and his reasons and subsequent conduct only aggravated the offense. Appellee never consented to a postponement of the ceremony. Appellee, in indigent circumstances, partly dependent for the support of herself and children upon the charity of her neighbors, was doubtless flattered by the attentions of a man of comparative ·wealth, enjoying a social position superior to her own. It is not likely that the engagement had its origin in love. As to the woman, it may have been founded partly in her necessitous condition, partly upon gratitude for what she deemed well meant kindness. The age of appellant does not ordinarily inspire love in a woman of twenty-four, and the evidence does not disclose that he possessed special attractions other than financial, superior to those of other men at his time of life; but whatever may have been the moving cause of their engagement, it was entered into, and without the fault of appellee was broken by appellant without justification.

It is the policy of the courts to insist on good faith in all social, domestic and business relations of life. The rule should not be relaxed in favor of a man of age and experience and against a member of the weaker sex struggling with the adverse conditions of poverty. The judgment should be affirmed.